UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:<br>PETITION OF JILL LEPORE | Misc. Action No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR ORDER DIRECTING
RELEASE OF RECORDS OF 1971 BOSTON GRAND JURY INVESTIGATIONS OF
THE PENTAGON PAPERS**

Jonathan M. Albano
Morgan, Lewis & Bockius LLP
One Federal St.
Boston, MA 02110
Tel: (617) 951-8360
Email:
jonathan.albano@morganlewis.com

Charles Crain, supervising attorney,
pro hac vice motion pending
John Langford, supervising attorney
Jessica Baker, law student
Yahui "Ellis" Liang, law student
MEDIA FREEDOM &
    INFORMATION ACCESS CLINIC
ABRAMS INSTITUTE
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Email: charles.crain@ylsclinics.org

Counsel for Petitioner

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                                      **ii**

**PRELIMINARY STATEMENT**                                                                      **1**

**FACTUAL BACKGROUND**                                                                         **2**

   I.   THE PENTAGON PAPERS LEAK                                  2

   II.  THE LOS ANGELES GRAND JURY INVESTIGATION                     3

   III. THE BOSTON GRAND JURY INVESTIGATIONS                            4

   IV. PROFESSOR LEPORE'S INTEREST IN AND ATTEMPTS TO GAIN ACCESS TO THE GRAND JURY RECORDS            6

**ARGUMENT**                                                                                  **8**

   I.   THIS COURT HAS INHERENT AUTHORITY TO RELEASE HISTORICALLY SIGNIFICANT GRAND JURY RECORDS            8

   II.  THE RECORDS OF THE BOSTON GRAND JURIES CONVENED TO INVESTIGATE THE PENTAGON PAPERS LEAK SHOULD BE DISCLOSED IN LIGHT OF THEIR HISTORICAL SIGNIFICANCE            10

      i.     Petitioner's identity                         11

      ii.    Whether the defendant to the grand jury proceeding or the government opposes disclosure            12

      iii.   The purpose of the request for disclosure            12

      iv.   Specific information sought to be disclosed            16

      v.     How long ago the grand juries took place            16

      vi.    Status of the principals and their families            18

      vii.   Previous disclosures                          18

      viii.  Whether witnesses are alive                  18

      ix.    Additional need for maintaining secrecy            19

**CONCLUSION**                                                                                **20**

# TABLE OF AUTHORITIES

**Cases**

*Butterworth v. Smith*,
    494 U.S. 624 (1990) ................................................................................................. 17

*Carlson v. United States*,
    109 F. Supp. 3d 1025 (N.D. Ill. 2015) ........................................................... 10

*Carlson v. United States*,
    837 F.3d 753 (7th Cir. 2016) ........................................................... 10,11,12

*Craig v. United States (In re Craig)*,
    131 F.3d 99 (2d Cir. 1997) ............................................................., *passim*

*Douglas Oil Co. v. Petrol Stops Nw.*,
    441 U.S. 211 (1979) ................................................................................... 8

*Gravel v. United States*,
    408 U.S. 606 (1972) ................................................................................. 14

*In re Am. Historical Ass'n*,
    49 F. Supp. 2d 274 (S.D.N.Y. 1999) ............................................. 9,12, 16, 17

*In re Grand Jury Proceedings*,
    417 F.3d 18 (1st Cir. 2005) ................................................................... 9

*In re Kutler*,
    800 F. Supp. 2d 42 (D.D.C. 2011) ..................................................., *passim*

*In re Nat'l Sec. Archive*,
    No. 08 Civ. 6599 (AKH), 2008 WL 8985358 (S.D.N.Y. Aug. 26, 2008) ..................... 19

*In re Nichter*,
    949 F. Supp. 2d 205 (D.D.C. 2013) ............................................................ 17

Minute Order, *In re Petition for Order Directing Release of the "Road Map" Transmitted by the Watergate Grand Jury to the House Judiciary Committee in 1974*,
    No. 1:18-mc-00125 (D.D.C. Oct. 18, 2018) ................................................. 17

*In re Pitch*,
    275 F. Supp. 3d 1373 (M.D. Ga. 2017) ...................................................... 11

*In re Tabac*,
    No. 3:08-mc-0243, 2009 WL 5213717 (M.D. Tenn. Apr. 14, 2009) ........................... 11

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ................................................................................ 3, 13

*Pittsburgh Plate Glass Co. v. United States*,
 360 U.S. 395 (1959) ................................................................................................... 8,9

*United States v. Aisenberg*,
 358 F.3d 1327 (11th Cir. 2004) ............................................................................... 9

*United States v. Doe*,
 460 F.2d 328 (1st Cir. 1972) .......................................................................... 14,15,18

*United States v. Procter*,
 356 U.S. 677 (1958) .................................................................................................. 16

*United States v. Rose*,
 215 F.2d 617 (3rd Cir. 1954) .................................................................................... 16

**Rules**

Fed. R. Crim. P. 6(e) ...................................................................................................... 8,9

Fed. R. Crim. P. 6(e), Advisory Committee's Notes (1944) ................................................. 9

**PRELIMINARY STATEMENT**

Petitioner Jill Lepore, a professor of American history at Harvard University and a staff writer for the *New Yorker*, seeks disclosure of the records of two 1971 Boston grand juries convened to investigate the leak and publication of the Pentagon Papers. Between 1969 and 1971, Daniel Ellsberg photocopied and leaked a top-secret report—the "Pentagon Papers"— analyzing U.S. decision-making in Vietnam since 1945. When the *New York Times*, *Washington Post*, and other news organizations began publishing portions of the report in June 1971, the Nixon Administration sought injunctions that the Supreme Court ultimately rejected. Meanwhile, a Los Angeles grand jury indicted Ellsberg for theft and espionage. Ellsberg's first trial ended in a mistrial and a second unraveled when disclosures related to the Watergate scandal revealed that men working for the White House had broken into the office of Ellsberg's psychiatrist.

Over the last 47 years, the story of the Pentagon Papers' leak and publication has assumed an almost mythic quality in the American psyche. Historians, lawyers, political scientists, journalists, and Hollywood have returned to the story repeatedly to excavate its unfolding and trace its import. It is now recognized as central to one of the most infamous abuses of executive power in American history, as one of the most consequential leaks in the history of American government, and as a crucial turning point in the history of American press freedom.

And yet, despite the multitude of books, articles, and films that have examined the Pentagon Papers, a crucial portion of the story remains hidden from public view. In the spring and summer of 1971, prosecutors convened two grand juries in Boston to investigate the leak. Compared to the publicity devoted to other aspects of the Pentagon Papers affair, little is known about these grand juries. We know that prominent academics Noam Chomsky, Samuel Popkin,

and Richard Falk, among others, were subpoenaed, and that Popkin was jailed for contempt when he refused to cooperate. But the scope and targets of the investigations remain unknown.

Today, the records of those grand juries—the key historical evidence necessary to understand those proceedings—sit under lock and key at the National Archives in Boston. When Professor Lepore requested those records, the National Archives refused to produce them, citing the grand jury secrecy provisions of the Federal Rules of Criminal Procedure.

Professor Lepore therefore petitions this Court to order the National Archives to make those records public. This Court has inherent authority to unseal grand jury records, and the historical significance of the Boston grand jury proceedings outweighs any remaining need for secrecy. After half a century there is no longer any law enforcement or national security rationale for continued secrecy. Some of the people subpoenaed by the grand jury or implicated in its investigation are deceased; others strongly favor releasing the records. Meanwhile, disclosure would fill a significant gap in the public's understanding of the Pentagon Papers episode and contribute to contemporary debates over press freedom and national security. For these reasons, Professor Lepore respectfully petitions this Court to allow the public to access and learn from records at the core of a seminal and enduringly important moment in American history.

## FACTUAL BACKGROUND[1]

### I.  THE PENTAGON PAPERS LEAK

In 1969, Daniel Ellsberg, an analyst at the RAND Corporation, began photocopying a top-secret report analyzing U.S. decision-making in Vietnam from 1945 to 1968. The report, famously known as the Pentagon Papers, was a 7,000 page, forty-seven-volume study

---

[1] The petitioners hereby incorporate by reference the detailed factual background concerning the Pentagon Papers and ensuing grand jury investigation from the Declaration of Jill Lepore (hereinafter "Lepore Decl."). *See* Lepore Decl. at ¶¶ 11-44.

commissioned by Defense Secretary Robert McNamara. Ellsberg sought to leak the papers to expose decades of futility and deception in the U.S. government's prosecution of the Vietnam War, in the hope that the public might act to end it.[2] After failing to persuade a member of Congress to publicize the report, Ellsberg leaked the documents to the *New York Times*, the *Washington Post*, and fifteen other newspapers.[3] The *Times* began publishing portions of the Pentagon Papers on June 13, 1971,[4] and the *Washington Post* and other newspapers followed suit a few days later.[5] The Department of Justice sought temporary restraining orders against the *Times* and the *Post* to halt publication, but on June 30, 1971, the Supreme Court upheld the newspapers' right to publish the study.[6]

## II.   THE LOS ANGELES GRAND JURY INVESTIGATION

In the period between Ellsberg's photocopying of the Pentagon Papers and their publication in the *Times*, the United States Department of Justice initiated two criminal investigations; grand juries were empaneled in Los Angeles and Boston. The better-known Los Angeles grand jury focused on how Ellsberg had copied the documents while he was employed by the RAND Corporation.[7] On June 28, 1971, that grand jury indicted Ellsberg and his friend and former RAND colleague Anthony Russo, now deceased, on charges of theft and espionage. Russo cited the Fifth Amendment, refused to testify, and was sent to jail for contempt.[8]

---

[2] Manuel Klausner & Henry Hohenstein, *Why I Did It!: Interview with Daniel Ellsberg*, Reason (June 1973), http://reason.com/archives/2008/06/06/why-i-did-it.
[3] *Id.*
[4] Neil Sheehan, *The Covert War*, N.Y. Times, June 13, 1971, at 38, https://www.nytimes.com/1971/06/13/archives/the-covert-war.html.
[5] *See* Murrey Marder & Chalmers M. Roberts, *U.S. Planned Before Tonkin For War on North, Files Show*, Wash. Post, June 14, 1971, https://www.washingtonpost.com/politics/us-planned-before-tonkin-for-war-on-north-files-show/2012/06/07/gJQAMKyALV_story.html.
[6] *See N.Y. Times Co. v. U.S.*, 403 U.S. 713 (1971).
[7] Steven V. Roberts, *Ellsberg Indicted Again in Pentagon Case*, N.Y. Times, Dec. 31, 1971, at A1, https://www.nytimes.com/1971/12/31/archives/ellsberg-indicted-again-in-pentagon-case-russo-is-also-charged.html.
[8] Tim Findley, *Farewell to the Fifth Amendment*, Rolling Stone, Dec. 7, 1972, https://www.rollingstone.com/politics/politics-news/farewell-to-the-fifth-amendment-115813.

On December 29, 1971, the Los Angeles grand jury delivered second indictments of Ellsberg and Russo. Their trial began in January 1972, but was declared a mistrial after the court learned that the government had illegally wiretapped Ellsberg. A new trial commenced in January 1973. That spring, though, the court learned of additional government misconduct. The FBI had again illegally wiretapped Ellsberg; President Nixon's operatives—the White House Plumbers—had broken into Ellsberg's psychiatrist's office; and President Nixon's counsel had offered Judge William Byrne, who was presiding over the trial, a position as FBI director.[9] On May 11, 1973, Judge Byrne responded by dismissing all charges against Ellsberg and Russo.[10]

## III.   THE BOSTON GRAND JURY INVESTIGATIONS

Concurrently, in April 1971, the Department of Justice convened a grand jury in Boston to investigate the distribution of the Pentagon Papers.[11] Little is known about the April grand jury. Close observers say that it was discharged because jurors leaked the proceedings to the press, but no official sources have verified the reason for discharge. *See* Lepore Decl. ¶27.

A second Boston grand jury was impaneled in August of 1971.[12] Reports indicate that the second grand jury was convened to investigate Neil Sheehan, the *New York Times* reporter who first wrote about the Pentagon Papers,[13] but that has never been confirmed. That grand jury subpoenaed at least 13 people: Samuel Popkin, an acquaintance of Ellsberg's who had also conducted research in Vietnam; Ralph Stavins and Richard Falk, both of whom were affiliated

---

[9] *Judge William Byrne; Ended Trial Over Pentagon Papers*, Wash. Post, Jan. 15, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/01/14/AR2006011401165.html.
[10] Martin Arnold, *Pentagon Papers Charges Are Dismissed; Judge Byrne Frees Ellsberg and Russo, Assails 'Improper Government Conduct'*, N.Y. Times, May 12, 1973, at A1, http://movies2.nytimes.com/learning/general/onthisday/big/0511.html.
[11] M. David Landau, *The Ellsberg File*, Harvard Crimson, Sept. 22, 1971, https://www.thecrimson.com/article/1971/9/24/the-ellsberg-file-pbibt-is-unfortunate; *see also* Martin Arnold, *Ellsberg Calls Use of Subpoena Illegal*, N.Y. Times, Dec. 21, 1972, at 26.
[12] *New Jury Studies Pentagon Papers*, N.Y. Times, July 21, 1971, at 33, https://www.nytimes.com/1971/07/21/archives/new-jury-studies-pentagon-papers-dismissal-of-panel-is-linked-to-a.html.
[13] *Id.*

with the Institute for Policy Studies; U.S Senator Mike Gravel of Alaska and his legislative aide

Leonard Rodberg; Howard Webber of the MIT Press; Stewart E. Perry, a neighbor of Ellsberg's;

the reporter David Halberstam; MIT linguist and antiwar activist Noam Chomsky; K. Dun

Gifford, a former legislative aide to Senator Edward M. Kennedy; N. Carter de Paul Jr., a former

U.S. Operations Mission Director in Laos; Idella Marx, Ellsberg's mother-in-law;[14] and Stephen

Parkhurst, vice president at New England Merchants Bank.[15] Staff of Beacon Press, which

published the Pentagon Papers, were also subpoenaed by the Boston grand jury but those

subpoenas were withdrawn.[16]  Many of those subpoenaed refused to testify but at least four—

Marx, Perry, Gifford, Carter de Paul and Popkin—gave some testimony. *See* Lepore Decl. ¶ 36-

37; Perry Decl. ¶ 4; Popkin Decl. ¶ 4. The government excused some individuals after they

invoked the First Amendment or alleged that the government had illegally wiretapped them.[17] It

remains uncertain why the FBI subpoenaed some of the witnesses, including N. Carter de Paul

Jr., Stewart E. Perry, and Samuel Popkin, who had no apparent connection to the distribution of

the Pentagon Papers.

Of those subpoenaed to testify, Popkin faced the most severe consequences. He initially

appeared before the grand jury in August of 1971. He refused to answer several questions on the

grounds that doing so would violate his "scholar's privilege" (which he modeled after the

reporter's privilege) by forcing him to compromise confidential sources whom he had

interviewed for his dissertation.[18] He was released from further testimony.[19] On October 14,

---

[14] Sanford J. Ungar, *More Cambridge Witnesses Subpoenaed on War Study*, Wash. Post, Oct. 9, 1971, at A3.
[15] 118 Cong. Rec. H12, 684 (daily ed. Apr. 13, 1972).
[16] 118 Cong. Rec. H12, 708 (daily ed. Apr. 13, 1972); *Supreme Court to Expedite Hearing on Gravel's Action in the Pentagon Papers Dispute*, N.Y. Times, Feb. 23, 1972, https://www.nytimes.com/1972/02/23/archives/supreme-court-to-expedite-hearing-on-gravels-action-in-the-pentagon.html.
[17] John Wood, *Professors cite 1st Amendment in opposing Papers testimony*, Boston Globe, Oct. 23, 1971, at 1.
[18] *Scholars back teacher facing Ellsberg quiz*, Boston Globe, Oct. 28, 1971, at 1.
[19] *For second time in Pentagon case: Federal jury subpoenas Prof. Popkin*, Boston Globe, Oct. 9, 1971, at 3.

1971, Popkin again appeared before the grand jury and again refused to answer questions, but this time his use of the "scholar's privilege" defense was not successful. He was called back to appear before the grand jury in March 1972.[20] After Popkin, for the third time, refused to answer several questions, Judge W. Arthur Garrity found him in contempt.[21] On November 21, 1972, after once again refusing to testify, Popkin was cited a second time for contempt, handcuffed, and hauled off to jail.[22] He spent eight days behind bars before the grand jury was unexpectedly discharged on November 28, 1972.[23] The reason for the discharge remains unknown. *See* Popkin Decl. ¶ 9, Lepore Decl. ¶ 44.

## IV.  PROFESSOR LEPORE'S INTEREST IN AND ATTEMPTS TO GAIN ACCESS TO THE GRAND JURY RECORDS

Professor Jill Lepore is the David Woods Kemper '41 Professor of American History at Harvard University, a staff writer at the New Yorker, and a past president of the Society of American Historians. Professor Lepore has a keen interest in the Boston grand jury investigations that stems from her research of and expertise in the history of evidence and the tension between publicizing archives and preserving their secrecy. In the nearly 50 years since the Pentagon Papers were first released, many articles, books, and films have been produced detailing the leak and the government's efforts to stop the publication of the papers.[24] The Los

---

[20] *Popkin: II*, Harvard Crimson, Mar. 28, 1972, https://www.thecrimson.com/article/1972/3/28/popkin-ii-pbtbhe-governments-intimidation-of/.

[21] *Id.*; Anthony Lewis, *The Grand Jury*, N.Y. Times, Apr. 24, 1972, at 35.

[22] Tom Wicker, *Liberty in Shackles*, N.Y. Times, Nov. 23, 1972, at 35.

[23] John Wood, *Move comes as surprise: Grand jury discharged, Popkin freed*, Boston Globe, Nov. 29, 1972, at 1.

[24] *See, e.g.*, The Post (20th Century Fox 2017); The Pentagon Papers (Paramount 2004); *The Most Dangerous Man in America: Daniel Ellsberg and the Pentagon Papers* (First Run Features 2009); Neil Sheehan and Hedrick Smith, *The Pentagon Papers: The Secret History of the Vietnam War* (2017); Daniel Ellsberg, *Secrets: A Memoir of Vietnam and the Pentagon Papers* (2003); H. R. McMaster, *Dereliction of Duty: Johnson, McNamara, the Joint Chiefs of Staff, and the Lies That Led to Vietnam* (1998); David Rudenstine, *The Day the Presses Stopped: A History of the Pentagon Papers Case* (1998); Katharine Graham, *The Pentagon Papers: Making History at the Washington Post* (2017); Steve Sheinkin, *Most Dangerous: Daniel Ellsberg and the Secret History of the Vietnam War* (2015); Sanford J. Ungar, *The Papers & the Papers: An Account of the Legal and Political Battle Over the Pentagon Papers* (1989).

Angeles grand jury's investigation of Ellsberg and his co-defendant Russo is also well-known as it resulted in two public trials. *See* Lepore Decl. ¶ 24. But there is sparse public information on the Boston grand jury investigations. Though the names of several of the witnesses who were subpoenaed and a transcript of some of Popkin's testimony were disclosed in contemporary newspaper reports, the official purpose of the grand juries, the transcripts of the proceedings, and the reasons for discharge are a mystery. *See* Lepore Decl. ¶¶ 9, 29, 44.

Professor Lepore learned of the Boston grand juries while working on her forthcoming book on the Simulmatics Corporation—a data-science research company that conducted research in Vietnam—and the relationship of the company's personnel to the Pentagon Papers. Popkin was a young political scientist in the company, and his experience with the grand jury is at the center of Professor Lepore's book. Professor Lepore is seeking the disclosure of all documents concerning the 1971 Boston grand juries in order to complete her book. Professor Lepore also seeks the records to inform her research for a forthcoming article in *The New Yorker* on the Boston grand jury investigation.

Professor Lepore has interviewed dozens of people associated with the grand jury, including Ellsberg, Popkin, and Chomsky. She has also consulted archives across the country, including the MIT Archive, which contains a portion of Popkin's testimony, and the National Archives at Boston, where the official records of the Boston grand juries are held.

On June 7, 2018, Professor Lepore emailed a formal request to the archivist at the National Archives at Boston, Joan Gearin, who advised her that FOIA requests for the grand jury records would be denied because grand jury records are generally sealed indefinitely. *See* Lepore Decl. ¶ 48 & Lepore Decl. Ex. B. Professor Lepore visited the National Archives at Boston in June 2018 to inspect the small portion of records open to researchers and discovered only

motions and briefs filed by the parties and heavily redacted FBI reports. *Id.* None of the grand

jury material was made available. *Id.* On October 10, 2018, Professor Lepore followed up with

an emailed FOIA request for the release of the material. On October 15, Gearin denied the

request. *See* Lepore Decl. ¶ 49 & Lepore Decl. Ex. C. [25]

## ARGUMENT

## I.   THIS COURT HAS INHERENT AUTHORITY TO RELEASE HISTORICALLY SIGNIFICANT GRAND JURY RECORDS

While Federal Rule of Criminal Procedure 6(e) sets a default rule whereby grand jury

records are sealed, federal trial courts have inherent authority to order the release of historically

significant grand jury records. This follows from their broad discretion—within the bounds of

the general presumption favoring secrecy—to disclose grand jury records in appropriate

circumstances. As the U.S. Supreme Court has stated, "federal trial courts as well as the Courts

of Appeals have been nearly unanimous in regarding disclosure as committed to the discretion of

the trial judge. Our cases announce the same principle." *Pittsburgh Plate Glass Co. v. United

States*, 360 U.S. 395, 399 (1959). *See also Douglas Oil Co. of California v. Petrol Stops

Northwest*, 441 U.S. 211, 223 (1979) ("we emphasize that a court called upon to determine

whether grand jury transcripts should be released necessarily is infused with substantial

discretion"). Thus, while there is a long tradition of maintaining the secrecy of grand jury

proceedings, that tradition is not without exception.

Federal Rule of Criminal Procedure 6(e) itself provides several specific exceptions to the

rule of grand jury secrecy (*see* Fed. R. Crim. P. 6(e)(3)(E)), but those exceptions do not limit

---

[25] The request was denied on the following grounds: (i) to preserve the secrecy of grand jury proceedings per 5 USC 552 (b)(3), pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure; (ii) to protect information exempted from disclosure by statute per 5 USC 552 (b)(3) (the relevant statute in support of the (b)(3) withholding is 50 USC 3024 (i)(1), which protects sensitive intelligence sources and methods); and (iii) to protect the personal privacy of living individuals per 5 USC 552 (b)(6).

courts' inherent authority to order the disclosure of grand jury records for other reasons not specified in Rule 6. The Supreme Court has noted that "Rule 6(e) is but declaratory of" the principle that disclosure is ultimately "committed to the discretion of the trial judge." *Pittsburgh Plate Glass*, 360 U.S. at 399. The First Circuit has recognized that "[a]lthough Rule 6(e)(3) enumerates the exceptions to the traditional rule of grand jury secrecy . . . [,] district courts have inherent power beyond the literal wording of Rule 6(e)(3) to disclose grand jury material." *In re Grand Jury Proceedings*, 417 F.3d 18, 26 n.9 (1st Cir. 2005) (quoting *United States v. Aisenberg*, 358 F.3d 1327, 1347 (11th Cir.), cert. denied 543 U.S. 868 (2004)).

This reading of the Rule aligns with the approaches of other courts. The District Court for the District of Columbia, for example, has pointed out that "Rule 6(e) was not designed to ossify the exceptions to the general rule of grand jury secrecy—freezing the scope of such exceptions at the moment the rule was promulgated . . . ." *In re Kutler*, 800 F. Supp. 2d 42, 45 (D.D.C. 2011). Similarly, the Southern District of New York has recognized that "exceptions to the secrecy rule generally have developed through conformance of Rule 6 to the developments wrought in decisions of the federal courts, not vice versa." *In re Am. Historical Ass'n*, 49 F. Supp. 2d 274, 286 (S.D.N.Y. 1999) (internal quotation marks omitted).

This interpretation is also consistent with the intention of the Rule's drafters. When adopting the Rule, the Advisory Committee noted that Rule 6(e) "continues the traditional practice of secrecy on the part of members of the grand jury, *except when the court permits a disclosure*." Fed. R. Crim. P. 6(e), advisory committee's 1944 note (emphasis added).

Exercising their inherent authority, courts have regularly ordered the disclosure of historically significant grand jury records. Although the First Circuit has not yet confronted this question, every circuit that has addressed the issue has recognized a "historical" exception to the

traditional rule of grand jury secrecy. *See Carlson v. United States*, 837 F.3d 753 (7th Cir. 2016); *Kutler*, 800 F. Supp. 2d; *In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997). As the Second Circuit noted nothing "prohibits historical interest, on its own, from justifying release of grand jury material in an appropriate case." *Craig*, 131 F.3d at 105. When a historian sought the grand jury testimony of President Nixon and other materials related to the Watergate Special Prosecution Force, a district court ordered disclosure after finding that it would "foster further scholarly discussion, and improve the public's understanding of a significant historical event." *Kutler*, 800 F. Supp. 2d at 48. Similarly, a district court in the Seventh Circuit ordered the release of grand jury records related to a World War II espionage investigation of the *Chicago Tribune*, finding disclosure would accomplish the "worthy goals" of contributing to scholarship and "creat[ing] a more complete public record of the *Tribune* investigation." *Carlson v. United States*, 109 F. Supp. 3d 1025, 1035 (N.D. Ill. 2015), aff'd 837 F.3d 753 (7th Cir. 2016). In sum, this Court has inherent authority to order the disclosure of historically significant grand jury records.

## II.  THE RECORDS OF THE BOSTON GRAND JURIES CONVENED TO INVESTIGATE THE PENTAGON PAPERS LEAK SHOULD BE DISCLOSED IN LIGHT OF THEIR HISTORICAL SIGNIFICANCE

Public interest in releasing the records of the Pentagon Papers Boston grand juries greatly outweighs any need for continued secrecy. In *Craig*, the Second Circuit provided a roadmap for district courts to consider when presented with petitions to disclose grand jury records for their historical significance. *Craig*, 131 F.3d at 106. It held that courts should release grand jury records whenever their historical significance outweighs the need to maintain secrecy and laid out nine factors to consider in determining the balance of those interests:

(i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why disclosure is being sought in the particular case; (iv) what specific information is

10

being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material—either permissibly or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Id.* The Seventh Circuit and district courts in the D.C. and Eleventh Circuits have since applied the same test. S*ee Carlson*, 837 F.3d at 766-67; *Kutler*, 800 F. Supp. 2d at 47; *In re Tabac*, No. 3:08-MC-0243, 2009 WL 5213717, at *4 (M.D. Tenn. Apr. 14, 2009). When applied to the 1971 Boston grand juries, the factors weigh heavily in favor of disclosure.

### i.   Petitioner's identity

Petitioner's background as an accomplished author and historian weighs in favor of releasing the requested grand jury records. The first factor of the *Craig* test, the identity of the petitioner, favors release when petitioners are historical groups and historians. *See Kutler*, 800 F. Supp. 2d at 48 (finding first factor favored release where petitioners are scholars and historical groups); *In re Pitch*, 275 F. Supp. 3d 1373, 1382 (M.D. Ga. 2017) (finding petitioner's identity as "an accomplished author who has written many historical works" supported the first factor). This is true because historians seeking disclosure for research into a significant historical event do so for "a legitimate and important purpose." *Pitch*, 275 F. Supp. 3d at 1382. Here, Petitioner is a historian, Harvard professor, and journalist who has authored eleven books, including a best-selling volume on American history. *See* Lepore Decl. ¶ 2. She is also a past president of the Society of American Historians and in 2014 was named the American Historian Laureate. *Id.* Furthermore, she seeks disclosure of the Boston grand jury records for research into a significant historical event, the investigation into the distribution of the Pentagon Papers, with the ultimate goal of writing an article and book related to that event and the key people involved. *See* Lepore Decl. ¶¶ 8, 10, 45. Petitioner's identity, therefore, is that of an accomplished author and historian

11

who has the "legitimate and important purpose" of seeking to research a significant historical event—this weighs heavily in favor of disclosure.

### ii. Whether the defendant to the grand jury proceeding or the government opposes disclosure

Petitioner does not yet know whether the government will oppose disclosure or if there was a target in the grand jury proceedings. Petitioner notes, however, that "[g]overnment support [for releasing grand jury records] cannot 'confer' disclosure, nor can government opposition preclude it." *Craig*, 131 F.3d at 106. Several district courts have ordered disclosure of grand jury records in the face of government opposition when there was "undisputed historical interest in the requested records." *Kutler*, 800 F. Supp. 2d at 50. *See also Am. Historical Ass'n*, 49 F. Supp. 2d at 295 (granting petition in part despite government opposition); *Carlson*, 837 F.3d at 767 (upholding district court decision to disclose grand jury records despite government opposition).

### iii. The purpose of the request for disclosure

As the *Craig* court stated, to satisfy the third factor of the test, "an argument that significant historical interest militates in favor of release is totally appropriate and even weighty." *Craig*, 131 F.3d at 106. Such interest is particularly weighty in a case where disclosure will "foster[] vigorous and sustained debate . . . about broader issues concerning fundamental and, at times, countervailing aspects of our democracy," including freedom of expression, privacy, governmental investigative power, and the role and function of grand juries themselves. *Am. Historical Ass'n*, 49 F. Supp. 2d at 295. In such cases, access to information "inevitably enhances the accuracy of history and undermines the false conspiracy theories and revisionism that tend to arise when information remains secret." *Id*. Furthermore, "if historical interest in a specific case has persisted over a number of years, that serves as an important indication that the public's interest in release of the information is substantial." *Craig*, 131 F.3d at 107.

Here, this factor weighs overwhelmingly in favor of releasing the grand jury records. Interest in the Pentagon Papers has endured for decades. The leak and publication of the documents sparked extensive news coverage and a landmark U.S. Supreme Court case, *see New York Times Co. v. United States*, 403 U.S. 713 (1971), and has since been the subject of multiple films and books.[26] The events marked a turning point in American history, contributing to the end of the Vietnam War and Nixon's presidency. *See* Lepore Decl. ¶ 12.

Historical interest in the Pentagon Papers saga has endured because of the broader issues the leak brought to the forefront of American discourse. The papers exposed government deception surrounding the Vietnam War, raising concerns about a lack of government transparency and accountability.[27] The Nixon administration's attempt to halt publication of the leaked documents helped define the relationship between the government and the free press.[28] Tensions between the press and the president are as evident today as it was then,[29] and the debate that raged in the 1970s over freedom of speech and government transparency rages still.[30] Access to the grand jury records will advance that debate and improve our understanding of a chapter in American history that has fascinated the public for decades.

The Boston grand jury records are not only central to the broader history of the Pentagon Papers, but also significant in themselves because of their place in American legal history. The

---

[26] *See supra* note 24.

[27] *See* John Prados, *Inside the Pentagon Papers* (Univ. Press of Kansas 2004).

[28] *See generally* David Rudenstine*, The Day the Presses Stopped: A History of the Pentagon Papers Case* (1998) (discussing the Nixon administration's unprecedented effort to enjoin the press and the subsequent legal battle over prior restraint); *see also N.Y. Times Co. v. United States*, 403 U.S. 713 (1971).

[29] *See* Michael E. Miller, *Nixon had an Enemies List. Now so does Trump*., Wash. Post, Aug. 19, 2018, https://www.washingtonpost.com/news/retropolis/wp/2018/08/17/nixon-had-an-enemies-list-now-so-does-trump/; Nancy Benac, *Remember Nixon: There's History Behind Trump's Attacks on the Press*, Associated Press, Feb. 17, 2017, https://apnews.com/8b29195631f44033ad94d8b2b74048c0/remember-nixon-theres-history-behind-trumps-press-attacks.html.

[30] *See* Jerome A. Barron, *The Pentagon Papers Case and the Wikileaks Controversy: National Security and the First Amendment*, 1 Wake Forest J. L. & Pol'y 49 (2011); Christina E. Wells, *Restoring the Balance between Secrecy and Transparency: The Prosecution of National Security Leaks under the Espionage Act*, 11 Advance 143 (2017).

13

grand juries drew widespread attention for their focus on "anyone . . . suspected of involvement with the release and publication of classified government material." *See* Lepore. Decl. ¶ 9. The August grand jury subpoenaed scholars, journalists, and a U.S senator's aide, fueling public debate over the reporter's privilege, a "scholar's privilege" and legislative immunity.[31] This resulted in legal battles over who could be subpoenaed by a grand jury, *see Gravel v. United States*, 408 U.S. 606 (1972) and *United States v. Doe,* 460 F.2d 328 (1st Cir. 1972), and contributed to calls for reform. *See* Lepore Decl. ¶¶ 54-55. The resulting litigation has had a lasting impact on the law governing witness testimony before grand juries.

The Boston grand jury subpoenaed Leonard Rodberg, who was an Institute for Policy Studies fellow and an assistant to U.S. Senator Mike Gravel. Gravel, who chaired a Senate subcommittee, had entered the Pentagon Papers into the public record and provided them to a publisher. *See* Gravel Decl. ¶ 2. He filed a motion to quash Rodberg's subpoena, arguing that requiring his assistant to testify "would violate his privilege under the Speech or Debate Clause of the United States Constitution." *Gravel*, 408 U.S. at 609. The case went to the Supreme Court, which issued a landmark decision on the constitutional protections afforded by the clause.[32]

The grand jury's subpoena of Samuel Popkin, a Vietnam scholar and assistant professor at Harvard, drew particular interest "as a landmark confrontation regarding academic freedom." *See* Lepore. Decl. ¶ 52. That confrontation was the subject of widespread news coverage and has

---

[31] *See* Robert Reinhold, *Legal Obstacles Blocking Boston Grand Jury in its Investigation of the Pentagon Papers*, N.Y. Times, Nov. 1, 1971, https://www.nytimes.com/1971/11/01/archives/legal-obstacles-blocking-boston-grand-jury-in-its-investigation-of.html; Bill Kovach, *Harvard Professor Jailed in Pentagon Papers Case*, N.Y. Times, Nov. 22, 1972, https://www.nytimes.com/1972/11/22/archives/new-jersey-pages-harvard-professor-jailed-in-pentagon-papers-case.html; Richard J. Meislin, *Popkin Faces Hearing for Contempt*, Harv. Crimson, Jan. 19, 1972, https://www.thecrimson.com/article/1972/1/19/popkin-faces-hearing-for-contempt-pgovernment/; M. David Landau, *The Ellsberg File*, Harv. Crimson, Sept. 22, 1971, https://www.thecrimson.com/article/1971/9/24/the-ellsberg-file-pbibt-is-unfortunate.
[32] Sam J. Ervin, *The Gravel and Brewster Cases: An Assault on Congressional Independence*, 59 Va. L. Rev. 175, 177 (1973); Sarah Letzkus, *Comment: Damned if You Do, Damned if You Don't: The Speech or Debate Clause and Investigating Corruption in Congress*, 40 Ariz. St. L.J. 1377, 1396 (2008).

since been addressed by several scholarly articles and books.[33] Popkin refused to answer certain questions during his grand jury testimony and was held in contempt. *United States v. Doe*, 460 F.2d at 329. The First Circuit rejected Popkin's argument that his refusal to answer questions was protected by the existence of a "scholar's privilege," similar to a reporter's privilege, *id.* at 334, and Popkin was eventually jailed. The *New York Times* reported Popkin was "believed to be the first American scholar . . . jailed for refusing to identify a source."[34]

The movement to reform the grand jury system in the years following the Boston investigation are yet another indication of the historical significance of these events. Critics highlighted the problem of potential misuse of grand juries. S*ee* Lepore. Decl. ¶¶ 54-55. During debate of the Grand Jury Reform Act of 1978, subcommittees in the U.S. House and Senate repeatedly cited the Boston investigations. *Id.* A portion of Popkin's testimony was reproduced in one of these exchanges. *Id.* Scholarly articles discussing calls for reform of the grand jury system have also routinely cited the Boston grand jury.[35]

The Boston grand juries stirred public interest from the courtroom to the floors of Congress, and have produced crucial debates over academic freedom and the broad powers of the grand jury. The third *Craig* factor therefore weighs heavily in favor of disclosure.

---

[33] *See, e.g.*, James Goodale, *Fighting for the Press: The Inside Story of the Pentagon Papers and Other Battles* (2013); James D. Carroll*, Confidentiality of Social Science Research Sources and Data: The Popkin Case*, 3 PS 268 (1973); C. M., *Editorial: The Case of Samuel Popkin*, 5 Change 16 (1973); Robert M. Tyler and Doris Kaufman, *The Public Scholar and the First Amendment: A Compelling Need for Compelling Testimony*, 40 Geo. Wash. L. Rev. 995 (1972).
[34] Bill Kovach, *Popkin Freed in a Surprise as U.S. Jury Is Dismissed*, N.Y. Times, Nov. 29, 1972, at A1.
[35] *See, e.g.*, Lynn Cobden, *The Grand Jury—Its Use and Misuse*, 22 Crime & Delinquency 149 (1976); Judith A. Melville, *Protective Warnings for Grand Jury Witnesses: Facing Historic and Legal Realities*, 28 Am. U. L. Rev. 363 (1979); and The Committee on Federal Legislation and the Committee on Civil Rights, *Grand Jury Reform*, 35 Recording Association of the Bar of the City of New York 219 (1979).

### iv.      Specific information sought to be disclosed

The fourth *Craig* factor requires courts to consider the scope of the disclosure sought. *See Craig*, 131 F.3d at 106-07. Here, Professor Lepore is seeking witness testimony and all related material from the Boston grand juries, including FBI reports. Although the scope of the present request is broad, it is commensurate with the degree of public interest in the information sought. Disclosure of these grand jury records will fill significant outstanding gaps in the historical record of the Pentagon Papers, including why the Boston investigations were opened, whether the FBI engaged in unlawful wiretapping as critics alleged at the time, and why the August grand jury was so abruptly dissolved. *See* Lepore Decl. ¶ 9. Unsealing the entirety of the Boston grand jury records—or, at minimum, the vast majority of those records—is the only way to answer these questions and vindicate the public's "significant . . . interest in ensuring the pages of history are based upon the fullest possible record." *Am. Historical Ass'n*, 49 F. Supp. 2d at 295.

### v.       How long ago the grand juries took place

The timing of the petition is the fifth and "one of the most crucial elements" of the *Craig* test. *See* 131 F.3d at 107. The passage of time "erodes many of the justifications for continued secrecy." *Id.* Grand jury proceedings are kept secret to prevent those who are about to be indicted from fleeing or influencing grand jurors, to protect witnesses from tampering and encourage them to disclose freely, and to protect the exonerated "from disclosure of the fact that he has been under investigation." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 n.6 (1958) (quoting *United States v. Rose*, 215 F.2d 617, 628-29 (3d Cir. 1954)). Each of those interests fade over time. *See Craig*, 131 F.3d at 107.

Here, nearly 50 years have passed since the Boston grand juries were convened, and the passage of time has greatly diminished any interest in maintaining the secrecy over the proceedings. In fact, most of those justifications for secrecy dissolved with the Boston grand

juries. "When an investigation ends, there is no longer a need to keep information from the targeted individual in order to prevent his escape. . . or to prevent the importuning of grand jurors since their deliberations will be over." *Butterworth v. Smith*, 494 U.S. 624, 632-633 (1990). Similarly, there is no longer any need to guard against witness tampering.

Only two of the traditional justifications for maintaining secrecy are implicated here: promoting free disclosures by witnesses and protecting innocent accused. But even those would only be minimally implicated by disclosure. In general, the "inhibiting effect of [time-delayed] disclosure is insignificant, especially when compared with far more immediate potential causes of disclosure, such as leaks, general press attention, public statements by witnesses and revelations at trial." *Am. Historical Ass'n*, 49 F. Supp. 2d at 292.

This is particularly true for historically significant grand jury proceedings, since contemporary publicity, along with the risk of leaks and other public disclosures, "make the possibility of disclosure decades hence based on historical interest seem a trifling concern, or even an inevitability." *See id.* When the District Court for the District of Columbia ordered the release of President Nixon's grand jury testimony, it explained that it "[did] not believe that disclosing thirty-six-year-old records for historical purposes w[ould] deter future witnesses from providing grand jury testimony." *Kutler*, 800 F. Supp. 2d at 49. Other key documents related to the Watergate investigation have also been disclosed. *See In re Nichter*, 949 F. Supp. 2d 205 (D.D.C. 2013); Minute Order, *In Re Petition for Order Directing Release of the "Road Map" Transmitted by the Watergate Grand Jury to the House Judiciary Committee in 1974*, No. 1:18-mc-00125 (D.D.C. Oct. 18, 2018). Thus, the passage of nearly 50 years erodes traditional justifications for secrecy.

###### vi.      Status of the principals and their families

The sixth factor of the *Craig* test concerns the status of the principals of the grand jury. *See Craig*, 131 F.3d at 106. Petitioner does not know the identity of the principals of the investigations and therefore cannot meaningfully address this factor in her opening brief.

###### vii.      Previous disclosures

The seventh factor directs courts to consider "the extent to which the desired material -- either permissibly or impermissibly – has been previously made public" and weigh such disclosures in favor of releasing the full record. *Id*. "[E]ven partial previous disclosure often undercuts many of the reasons for secrecy." *Id.* at 107. Here, several witnesses have openly discussed the grand jury investigation, both during the proceedings and in the decades since. *See* Lepore Decl. ¶¶ 44-45. Unofficial transcripts of Popkin's testimony have been published, in part, in news articles and scholarly journals. *Id.* Portions of his testimony are also available in a published First Circuit opinion, *see United States v. Doe*, 460 F.2d at 330, and were discussed during congressional hearings. *See* Lepore Decl. ¶ 54. Due to the widespread news coverage of, and historical interest in, the Pentagon Papers episode and the Boston grand juries, the identities of many witnesses are already public knowledge.[36] The seventh factor therefore weighs in Petitioner's favor.

###### viii.      Whether witnesses are alive

The eighth factor, concerning the status of the grand jury witnesses who might be affected by disclosure, favors releasing the records. *See Craig*, 131 F.3d at 106. Of particular concern is whether the privacy interests of surviving witnesses will be negatively impacted by disclosure. *Kutler*, 800 F. Supp. 2d at 49. But the witnesses here have little interest in continued

---

[36] *See* Ungar, *supra* note 14; *supra* note 24.

secrecy. Many of the surviving witnesses and subpoenaed parties support disclosure. *See* Popkin Decl. ¶ 11; Perry Decl. ¶ 5; Chomsky Decl. ¶ 4; Gravel Decl. ¶ 5; Rodberg Decl. ¶ 6; Falk Decl. ¶ 6; Webber Decl. ¶ 6. Among the supporters are two people who testified: Stewart Perry and Samuel Popkin. Two other testifying witnesses—Idella Marx (Daniel Ellsberg's wife's stepmother) and K. Dun Gifford (a former aide to Senator Edward M. Kennedy)—are now deceased. *See* Lepore Decl. ¶ 46. Ralph Stavins stated to Petitioner's counsel that he does not wish to be involved in these proceedings, and expressed no opinion about whether the records should remain sealed. Liang Decl. ¶ 5. It is likely that other witnesses may be deceased or have only an attenuated privacy interest eroded by the passage of time.[37] *See In re Nat'l Sec. Archive*, No. 08 CIV. 6599 AKH, 2008 WL 8985358, at *1 (S.D.N.Y. Aug. 26, 2008) (ordering the release of grand jury testimony from witnesses who consented, were deceased or were presumed indifferent because of a failure to object to the release of their testimony). Furthermore, "privacy concerns are of limited significance" where—as is partially the case here—grand jury proceedings have already been made public. *See Kutler*, 800 F. Supp. 2d at 49.[38] Consequently, the witnesses are unlikely to be negatively impacted by disclosure.

### ix.   Additional need for maintaining secrecy

Finally, as to factor nine, the "additional need for maintaining secrecy in the particular case," no such need exists here due to the significant passage of time since these proceedings were held. See *Craig*, 131 F.3d at 106.

* * * * *

---

[37] Despite repeated attempts to contact N. Carter de Paul Jr., who was reported to have testified before the Boston grand jury, *see* Lepore Decl. ¶ 37, Petitioner was unable to locate or ascertain his status. Baker Decl. ¶ 2. It is also unknown whether Stephen Parkhurst, the vice president at New England Merchants Bank, ever testified.

19

The balance of the *Craig* factors overwhelmingly favors disclosure of the Boston grand jury records. Any interest in maintaining the secrecy of these records is outweighed by significant and continuing public interest in their disclosure.

## CONCLUSION

For the reasons above, Professor Lepore respectfully requests that this Court exercise its inherent authority to order disclosure of the records of the Boston grand juries convened to investigate the Pentagon Papers.

Dated: December 17, 2018                    Respectfully submitted,

                                             */s/ Jonathan M. Albano*
                                            Jonathan M. Albano
                                            Morgan, Lewis & Bockius LLP
                                            One Federal St.
                                            Boston, MA 02110
                                            Tel: (617) 951-8360
                                            Email: jonathan.albano@morganlewis.com

                                            Charles Crain, supervising attorney (pro hac vice motion pending)
                                            John Langford, supervising attorney
                                            Jessica Baker, law student intern
                                            Yahui "Ellis" Liang, law student intern
                                            MEDIA FREEDOM & INFORMATION ACCESS CLINIC
                                            ABRAMS INSTITUTE
                                            Yale Law School[*]
                                            P.O. Box 208215
                                            New Haven, CT 06520
                                            Tel: (203) 432-9387
                                            Email: charles.crain@ylsclinics.org

                                            Counsel for Petitioner

---

[*] This brief was prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School but does not purport to present the school's institutional views, if any.

20