UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PETITION OF<br>JILL LEPORE | No. |

## DECLARATION OF SAMUEL L. POPKIN

I, SAMUEL L. POPKIN, declare as follows:

1.I submit this declaration in support of the above-captioned petition to unseal the transcripts of my testimony before the federal grand jury impaneled in August 1971 in Boston to investigate the distribution of the Report of the Office of the Secretary of Defense Vietnam Task Force, better known now as the Pentagon Papers.

2.In the summer of 1971, FBI agents questioned me about the leak of the Pentagon Papers and Daniel Ellsberg. At the time, I was an assistant professor of government at Harvard University. Ellsberg and I were acquainted through our mutual interest in Vietnam, which was the subject of several articles I had written. I informed the FBI agents that while I knew Ellsberg, I had no prior knowledge of the leak of the Pentagon Papers. In fact, I was in Hong Kong when the papers were distributed. I discovered the leak, along with Ellsberg's involvement, at the same time as the general public.

3.Weeks after the FBI visited my home, I was subpoenaed to appear before the grand jury in August 1971. It would be the first of several grand jury subpoenas issued to me between the fall of 1971 and fall of 1972. Not once was I ever informed about the purpose of the grand jury investigation, or why the FBI had focused so inexplicably on me. Yet I was repeatedly called to appear before the grand jury and subjected to hours of broad, speculative,

and unrestrained questioning. It became apparent to me that the government was engaged in a fishing expedition.

4. During my multiple appearances before the grand jury, I answered a substantial number of the questions put to me. I told federal prosecutors and the grand jury I had never seen the Pentagon Papers except those copies distributed publicly, I never had a discussion with Ellsberg about distributing the Pentagon Papers, and I only knew as much as the general public, through news reports, about how the *New York Times* obtained copies of the Pentagon Papers.

5. Despite my forthright answers and lack of any firsthand knowledge about the Pentagon Papers leak, federal prosecutors continued to question me -- not about facts -- but about my opinions. I was asked to name anyone I had ever interviewed or had a conversation with who I thought may have had knowledge of the Pentagon Papers study or may have possessed the Pentagon Papers in Massachusetts. I refused to answer this line of questioning.

6. My primary concern was protecting decent and hard-working military servicemembers who were attending graduate school and had approached me for advice on their own research into Vietnam. They came to me in confidence, with hopes of improving the situation with Vietnam, as they rose through the military ranks. Furthermore, it was only after the Pentagon Papers were publicly released that I suspected the study was the catalyst for their questions. But, again, it was only speculation, and I felt it was improper for the government to ask me to relay such speculation to the grand jury without a proper finding of relevancy from a judge.

7. Additionally, I believed answering questions about my suspicions and opinions would have made it much more difficult for me to obtain interviews for future research as sources may be more reluctant to relay sensitive information, or speak at all, if their

conversations could be revealed in a government fishing expedition. I never felt I should have an absolute privilege to refuse to answer grand jury questions. My belief was that grand jury questions regarding anything beyond knowledge of a crime should first be presented to a judge to decide their relevance to the grand jury proceedings. I believed, and continue to believe, that a judge should be the adjudicator of what is necessary.

8.  Because of my refusal to answer questions concerning my opinion on who may have possessed the Pentagon Papers before the *New York Times* published the documents, I was cited for contempt in March of 1972. I appealed the decision to the First Circuit Court of Appeals, but the court rejected my relevancy argument and upheld the contempt citation in *United States v. Doe*, 460 F.2d 328 (1st Cir. 1972). After losing in the First Circuit, I petitioned for a writ of certiorari from the U.S. Supreme Court but was denied. The solicitor general, Erwin Griswold, had argued against cert by assuring the Court that prosecutors would no longer request I provide the names of my confidential contacts. However, after cert was denied, prosecutors continued to request that I give them names.

9.  In November of 1972, I was ordered by a federal judge to begin serving my sentence for contempt. The *New York Times* reported I was "believed to be the first American scholar…jailed for refusing to identify a source." I was imprisoned at the Dedham County Jail and ordered to remain there until the grand jury concluded its proceedings. Quite unexpectedly, the grand jury was abruptly dismissed several days later and I was released from jail, marking the end of a 15-month-long legal tug-of-war.

10. Although my legal battle with the government ended 46 years ago, I believe it raised important legal questions and arguments, which remain relevant today. The district and appellate courts may have ruled against my relevancy argument as it relates to grand jury

questions, but the case itself highlights the grand jury's near limitless power to question and consequent fears that grand juries could become a tool of the government to interrogate scholars and journalists about their confidential sources.

11. Unofficial transcripts of my testimony were published at the time of the grand jury proceeding, as I often relayed the details of my questioning to the press. However, I believe the official transcript and full grand jury record should be made available to the public. Releasing the full record will help shed light on the confusion that can result when prosecutors fish in sensitive waters and why it is important to prevent such wide-ranging fishing expeditions. Further, the full record will help explain why I argued that a judge should adjudicate in a private hearing whether certain questions are relevant, particularly those pertaining to the confidential sources of scholars and journalists. For these reasons, I support the release of a transcript of my testimony and other records related to the Boston grand jury investigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 12, 2018, in San Diego, California.

*/s/ Samuel Popkin*
Samuel Popkin